IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MATTHEW FOGEL,

    Plaintiff,

    v.

GRASS VALLEY POLICE DEPARTMENT, et al.,

    Defendants.

No. Civ. 05-0444 DFL KJM

ORDER

    Plaintiff Matthew Fogel ("Fogel") painted a provocative message on the back of his car. The police were called and arrested him. No charges were filed. Fogel now brings suit against defendants Grass Valley Police Department, Captain Jarod Johnson ("Johnson"), Sergeant Michael Hooker ("Hooker"), and Officers Jason Perry ("Perry"), Wesley Collins ("Collins"), Gary McClaughry ("McClaughry"), and Greg McKenzie ("McKenzie"). Plaintiff seeks damages under § 1983, primarily on the theory that his arrest violated the First Amendment. He also brings claims based on the Fourth and Fourteenth Amendments as well as state law claims for false arrest and assault and battery.

1

Defendants move for summary judgment on all claims. The individual defendants also assert that they are entitled to qualified immunity. Plaintiff cross moves for summary judgment on the § 1983 claims. For the reasons stated below, the court GRANTS defendants' motion for summary judgment on all claims and DENIES plaintiff's motion.

I.

On May 25, 2004, Fogel painted the following message on his 1970 Volkswagen van: "I am a fucking suicide bomber communist terrorist! Pull me over! Please, I dare ya! Allah praise the Patriot Act . . . Fucking JIHAD on the First Amendment! P.S. W.O.M.D. on Board!" (Defs.' Statement of Undisputed Facts ("SUF") ¶ 2.) The lettering was large and evidently intended to catch public attention. Fogel then visited friends at an apartment in Grass Valley, California and parked his van in the parking lot. (Id. ¶¶ 7, 8.) That evening, the Grass Valley Police Department received a call from a woman, who wished to remain anonymous, reporting a van with suspicious lettering. (Id. ¶¶ 14, 15.) Defendant Hooker was assigned to the report and went to the location of the van. He initially considered that the wording was "political satire," and that no further response was necessary, but thought it wise to check his judgment by consulting with his superior, defendant Johnson. (Hooker Dep. 56:1-4; Defs.' SUF ¶ 16.)

Johnson took a different view. He told Hooker to "handle this as a bomb threat" and to take the threat seriously because

2

the country was at an elevated threat level.  (Id. ¶ 18, 19.)
Hooker returned to the van to initiate a criminal investigation.
(Id. ¶ 21.)  About five minutes later, defendants Perry, Collins,
McKenzie, and McClaughry also arrived.  (Id.; Pl.'s SUF ¶ 9.)
Hooker put Perry in charge of the investigation.  (Id. ¶ 26.)
Perry advised Hooker that "Homeland Security was aware of Mr.
Fogel as being an anti-government person" living in Nevada City.
(Perry Dep. 44:3-45:18.)

　　　Hooker, Perry, and Collins found Fogel in apartment #22.
Perry asked Fogel if he could talk to him about the van.  (Pl.'s
SUF ¶ 11.)  Fogel said "yeah, sure" and "encouraged the officers
to search the van."  (Defs.' Reply to Pl.'s SUF ¶ 12; Compl. ¶
26.)  Perry's police report and Hooker's police report both state
that when Perry asked Fogel what he meant by the statements on
the van, Fogel said that "he did not agree with the United States
actions in the Middle East" or with the PATRIOT Act.  (Defs.'
Mot. Ex. C at 2, Ex. D at 6.)  The reports also state that Fogel
said that he meant to "scare people."  (Id.)

　　　Fogel denies telling the officers that he intended to
"scare" people.  (Id.; Fogel Dep. 45:10-14.)  Instead, he says
that he wanted to express his "disagreement . . . with the
PATRIOT Act" and his "frustration with local authorities" who, in
his experience, have infringed on his and others' rights of
expression.  (Fogel Dep. 25:4-19.)

　　　After Perry finished questioning Fogel, he searched the van
with Fogel's consent.  (Compl. ¶ 27.)  Perry did not follow the

3

1  police department's bomb threat procedure while searching.
2  (Perry Dep. 69:3-71:24.)  Ultimately, Perry did not find a bomb
3  or any "weapon of mass destruction."  (Id. at 72:6-11.) Perry
4  arrested Fogel for violating California Penal Code §§ 422, 148.1,
5  and 415.[1]  (Defs.' SUF ¶¶ 56, 57.)

6  Following Fogel's arrest, Hooker impounded the van and
7  instructed the towing company not to release it until Fogel
8  removed the writing.  (Id. ¶¶ 22, 23.)  Fogel was released from
9  jail early the next morning.  (Defs.' SUF ¶ 61.)  He recovered
10 his van the same day after he painted over the words with white
11 paint.  (Fogel Dep. 48:24-49:17.)

12 No charges were filed.  (Id. ¶ 73.)

## II.

Fogel's main contention is that the speech on the van was protected by the First Amendment, and, therefore, that the defendants violated the Constitution by placing him under arrest and impounding the van.  Of course, plaintiff is entitled to express disagreement with the PATRIOT Act and to mock the nation's war on terrorism.  Thus, the statement, for example, "Allah praise the Patriot Act . . . JIHAD on the First

---

[1] Section 422 makes it a crime to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person."  Section 148.1 makes it a crime to "maliciously inform[] any other person that a bomb or other explosive has been or will be placed or secreted in any public or private place, knowing that the information is false."  Section 415 makes it crime to use "offensive words in a public place which are inherently likely to provoke an immediate violent reaction."

4

1 Amendment!" is protected speech.  On the other hand, it is
2 equally the case that "true threats" are not protected speech.
3 Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399 (1969).
4 A true threat is "an expression of an intention to inflict evil,
5 injury, or damage on another."  Planned Parenthood of
6 Columbia/Willamette, Inc. v. Am. Coalition of Life Activists, 290
7 F.3d 1058, 1075 (9th Cir. 2002).  Laws prohibiting such threats
8 "protect individuals from the fear of violence" and "from the
9 disruption that fear engenders."  Virginia v. Black, 538 U.S.
10 343, 360 (2003).  The question here is whether Fogel's statement
11 that he was "a fucking suicide bomber communist terrorist!" with
12 "W.O.M.D. on Board" was a "true threat."

13    Whether a particular statement is a "true threat" depends on
14 "whether a reasonable person would foresee that the statement
15 would be interpreted by those to whom the maker communicates the
16 statement as a serious expression of intent to harm or assault."
17 United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir.
18 1990).  In answering this question, the fact-finder should
19 evaluate the "entire factual context, including the surrounding
20 events and reaction of the listeners."  Id.  A threat may be a
21 "true threat" even though the speaker did not intend, and lacked
22 the ability, to carry out the threat.  Planned Parenthood, 290
23 F.3d at 1075.  "The only intent requirement for a true threat is
24 that the [speaker] intentionally or knowingly communicate the
25 threat."  Id.
26    Under the reasonable person test, mere "political hyperbole"

5

does not amount to a "true threat." Watts, 394 U.S. at 708. In Watts, a young war protester speaking at a public rally at the Washington Monument stated:

> They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.

Id. at 706. The audience and speaker then laughed. After examining the statement in context and recognizing the listeners' reactions, the Court concluded that the speech was not a true threat. Id. at 708. It could only be interpreted as "a kind of very crude offensive method of stating a political opposition to the President." Id.

Except in a circumstance in which the statement is only fairly susceptible of one characterization – true threat v. political hyperbole – whether a statement constitutes a "true threat" is a question of fact for the jury, not a question of law for the court. Melugin v. Hames, 38 F.3d 1478, 1485 (9th Cir. 1994). Thus, granting summary judgment on this issue is inappropriate if a jury could reasonably return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).

In this case, a reasonable jury might conclude that a reasonable person would foresee that the words on the van would be taken "as a serious expression of intent to harm." First, as demonstrated in Watts, the reaction of listeners and the intent

6

of the speaker are relevant to what a reasonable person might think. Here, one woman found Fogel's words threatening enough that she called the police and chose to remain anonymous, and the jury could find that Fogel admitted that he intended to scare people. Second, the recency and enormity of terrorism on American soil is also relevant to what a "reasonable person" might foresee. Post-9/11 statements have a different effect than they might have had before that tragedy. Third, the words themselves, taken literally, state a threat: the person responsible for the van is a "suicide bomber communist terrorist," who dares the police to pull him over, and who has "W.O.M.D. on Board." Finally, the scrawled lettering, exclamation marks, and angry invective, in addition to the threatening language, placed on an aging van could persuade a reasonable viewer that whoever wrote the language was not a stable, rational individual. Thus, while a "rational" terrorist in possession of a threatening device or substance would not advertise his possession, a violent, unstable person seeking attention might do just that.

On the other hand, a jury might find that Fogel's words could not be reasonably interpreted as a serious threat. The references to the First Amendment and the PATRIOT Act arguably indicated the political nature of the message. Moreover, the jury might conclude that no reasonable person would believe that a suicide bomber would actually announce his presence or his possession of W.O.M.D.

7

In short, whether the language used by Fogel was protected by the First Amendment presents a disputed issue of fact. Neither party is entitled to summary judgment on this basis.

### III.

Alternatively, the individual defendants assert that they are entitled to qualified immunity. "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Lee v. Gregory, 363 F.3d 931, 934 (9th Cir. 2004) (citing Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). Usually when deciding a claim of qualified immunity, the court must first decide if a constitutional right has been violated on the plaintiff's alleged facts. If so, the court must then decide whether this right was clearly established at the time of the unconstitutional conduct. Here, as discussed above, there is a material issue of disputed fact as to whether a reasonable person would consider the language on the van as a true threat. Therefore, the court assumes that the conduct of the officers violated the First Amendment and passes to the second part of the Saucier inquiry: whether "a reasonable official would understand that what he is doing" violated the First Amendment. Id. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "[T]he salient question . . . is whether the state of the law [in 2004] gave [the officers] fair warning that their alleged treatment of [Fogel] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508 (2002).

It follows from the discussion above of the underlying constitutional question that the state of case law did not provide a clear answer as to whether the language on the van was a true threat or political commentary.  Fogel contends that under <u>Watts</u> only one answer could be given to this question.  But as discussed already, <u>Watts</u> is distinguishable both in what was said and where, when, and how it was said.  The court is not aware of any case that holds that language comparable to that used by Fogel is necessarily protected by the First Amendment.  Because a reasonable officer could conclude that the language used was not protected by the First Amendment, the court finds that the officer defendants are entitled to the protection of qualified immunity as to plaintiff's First Amendment claim.[2]

IV.

---

[2] Plaintiff makes the argument that the individual defendants may not claim qualified immunity because of their subjective belief that they were violating the First Amendment. There are three ways in which the argument fails.  First, the test for qualified immunity is objective; it asks what a reasonable officer would understand in the circumstances. Second, under the case law, the defendant officers could not have "known" that the actions here violated the First Amendment because no case had so held.  Finally, plaintiff does not succeed in showing that the officer defendants believed that they were acting in violation of the First Amendment.  Plaintiff claims that Hooker believed that the message was protected by the First Amendment because his first reaction was to consider the speech as "political satire."  But the fact that Hooker formed a tentative judgment and was overruled by a superior officer, does not equate to a belief by Hooker that the arrest was wrongful or violated clearly established law.  Further, that the officers did not believe that there was actually a bomb in the van, does not affect probable cause to arrest for making a threat because the crime does not require the present ability to carry out the threat.

9

Fogel advances a number of subsidiary claims that fail in light of the discussion in the preceding sections. His claims under the Fourth Amendment for unlawful arrest and seizure of the van fail because the defendant officers had probable cause to arrest Fogel and seize the van. As discussed above, a reasonable officer could believe that the language on the van stated a threat that a reasonable person would take seriously. It follows that the officers had probable cause to arrest Fogel, at least as to California Penal Code §§ 422 and 148.1, and to seize the van. For the same reasons, his state law "false imprisonment" and "assault and battery" claims fail since the arrest was lawful.

V.

In light of the rulings above, the only remaining claim is the First Amendment claim as against the Grass Valley Police Department. The Police Department may not claim the defense of qualified immunity. However, the Department is only liable under § 1983 upon a showing that there was unconstitutional action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Social Servs. of New York, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff makes no such showing of an unconstitutional official policy. At best, he demonstrates that one officer was overruled by a superior officer. However, there is no showing that either officer was a policy making official for the Police Department as a whole.

VI.

For the reasons stated above, the court GRANTS defendants' motion for summary judgment on all claims and DENIES plaintiff's cross motion for summary judgment.  The clerk shall enter judgment.

IT IS SO ORDERED.

Dated: 2/13/2006

_____
DAVID F. LEVI
United States District Judge